UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Western Division

REGGIE HALL )
    Plaintiff; )
 )
-vs.- )
 )  No. CV-98-P-1206-W
ULTIMATE COACH, INC. )
    Defendant. )

FILED
'99 DEC 20 PM 3: 12
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
DEC 20 1999

OPINION

The defendant's motion for summary judgment was taken under submission at the court's July 9, 1999 motion docket. After careful consideration, the court has concluded that summary judgment is due to be granted as to all of the plaintiff's claims.

Facts[1]

In the fall of 1996, the plaintiff was recommended for a bus driver position with the defendant. After he was contacted by one of the owners of Ultimate Coach, Jerry Burnside, the plaintiff and Burnside began discussing the plaintiff's possible employment. According to the plaintiff, Burnside asked if he would be available to drive a bus for a play and orchestra tour, but after repeated discussions did not hire the plaintiff for such a tour.

The plaintiff met with Burnside for an interview in Florence, Alabama. According to the plaintiff, Burnside told him that he would be given the next available "seat"[2] with Ultimate Coach.

---

[1] The recitation of facts is presented in the light most favorable to the plaintiff.

[2] A "seat" is a position as a primary driver on a coach.

1

The plaintiff claims that Burnside asked him what his nationality was at least five times during this meeting. The plaintiff then contacted the defendant on a weekly basis to determine if a seat was available. He alleges that, although Burnside told him that he would be given the next available seat, white drivers who subsequently contacted the defendant were hired before he was. It is undisputed that the plaintiff was the first, and only black driver hired by Ultimate Coach.

In May of 1997, the plaintiff began working for the defendant as a relief driver on the U2 tour.[3] After the two-month long U2 tour, Burnside received a complaint from at least one driver who told Burnside that he did not want to drive with the plaintiff because he is black. Burnside reported this conversation to the plaintiff.

After the U2 tour, the defendant placed the plaintiff on the REO Speedwagon tour. The defendant states that after the tour Burnside received a complaint from the band's manager about the plaintiff's driving. According to the manager's affidavit, the plaintiff refused to slow down when asked to do so and drove over seventy miles per hour. When the bus encountered a bad thunderstorm, the manager asked the plaintiff to pull over to the side of the road, but the plaintiff refused to do so for 45 minutes. The manager testified that he was concerned about the passengers' safety; so that when the bus arrived at its destination, he contacted Burnside and requested a replacement driver for the remainder of the tour. *See* Aff. of Ira Siegal.

In August 1997, the plaintiff was given a seat on a coach subleased by the defendant to a different company (Pyramid Coach). For Pyramid, the plaintiff drove on the Lee Ann Womack

---

[3]Ultimate Coach is a bus leasing company that provides coaches for large groups, including entertainers. U2, REO Speedwagon, and Lee Ann Womack are all musical groups that hired Ultimate Coach to provide buses for their tours.

tour. In his deposition, the plaintiff testified that these drives were extremely long, that he did not have a team driver to relieve him, and that he suffered from food poisoning during the tour.

According to the defendant, Pyramid's leasing agent received complaints from passengers on the Womack tour about the plaintiff's driving. The agent then requested that Ultimate Coach remove the plaintiff from the tour and replace him with a different driver. The agent testified in her affidavit that she also asked the defendant not to provide the plaintiff to her company in the future. *See* Aff. Of Jennifer George.

During the Womack tour, the plaintiff's coach was involved in an accident and damaged.[4] The plaintiff failed to report the accident to the company before he returned the coach.[5] Additionally, the defendant alleges that, in violation of company policy, the plaintiff failed to return Burnside's pages and a message left on the plaintiff's answering machine, to keep the coach clean, and to return log books to the defendant each week. On August 16, 1997, after he returned from the Womack tour, the plaintiff was terminated from his employment. After his termination, the plaintiff admitted to the defendant that the coach was damaged when he let a non-employee drive the bus.[6]

The plaintiff alleges that during the time he was employed at Ultimate Coach he was subjected to a racially hostile work environment. The plaintiff testified to several racially-

---

[4]The plaintiff describes this damage as a "nick" or a "scratch;" the defendant describes the coach as having been "wrecked."

[5]The plaintiff testified in his deposition that he tried to report it by calling the office, but could not reach anybody. *See* Pl.s Dep. at 112.

[6]The plaintiff states that he was extremely ill with food poisoning during the Lee Ann Womack tour. According to him, he permitted a member of Womack's group who had a valid CDL license to drive the bus to the venue.

3

derogatory statements made by co-employees. One of the defendant's employees told Burnside that "he did not want to drive with a 'nigger.'" Burnside reported this conversation to the plaintiff and at his deposition stated that he also told the plaintiff that these were not his or the company's view. According to the plaintiff, two co-employees used the word "nigger" in the plaintiff's presence. After the plaintiff told them he was offended, the employees apologized. Another employee stated to a black driver named Jose, "Hey Jose, they've got watermelon down here." After that comment, the employee was taken off of the U2 tour. The plaintiff also alleges that another employee, Ratcliffe, made the statement "I told you we shouldn't have hired him," and that this statement was racially motivated. However, that statement was made as Ratcliffe was examining the damaged coach that plaintiff had returned to the company.

On May 13, 1998, he filed suit in this court alleging race discrimination under Title VII and § 1981. He claims that he was discriminated against in (1) his hiring; (2) his termination (3) an allegedly hostile work environment at Ultimate Coach; and (4) retaliation for his complaints of racial slurs by other employees. He also states a state law claim of conversion regarding personal items that the plaintiff left on his coach and allegedly were not returned to him by the defendant.

## Analysis

On May 14, 1999, the defendant moved for summary judgment on the grounds that (1) the defendant did not have the requisite number of employees under Title VII; (2) the plaintiff's claim for discriminatory hiring is time-barred under Title VII; and (3) the plaintiff had failed to establish a prima facie case of discrimination. To proceed with his race discrimination claims, the plaintiff

4

must produce evidence from which a reasonable jury could find that the defendant's employment decisions were motivated by discriminatory intent. *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988). Both Title VII and § 1981 require such a showing. *See General Bldg. Contractors Ass'n. v. Pennsylvania*, 458 U.S. 375, 391 (1982). As the plaintiff has failed to produce credible evidence that the defendant's actions were motivated by illegal discrimination, the defendant's motion for summary judgment is due to be granted.[7]

I. Discriminatory Hiring

The plaintiff alleges that the defendant discriminated against him by promising the plaintiff the next available seat and then giving white drivers a seat before giving the plaintiff one, and by hiring the plaintiff as a relief driver[8] before giving him his own seat. As evidence of racial discrimination, the plaintiff offers 1) Burnside's testimony about other white drivers who were hired first; 2) the plaintiff's testimony that Burnside asked him his nationality at least five times during the initial interview;[9] and 3) the fact that Ultimate Coach had not hired a black driver before the plaintiff. In the abstract, these assertions could be evidence of a racial bias. However, the defendant has presented legitimate reasons for its behavior and the plaintiff's evidence does

---

[7]Because the plaintiff's claims do not survive summary judgment on the merits, the court declines to address the defendant's first two arguments.

[8]Department of Transportation regulations restrain coach drivers from driving over a certain number of hours per day. A relief driver or team driver substitutes for a primary driver so that the primary driver will not violate these regulations.

[9]In his testimony, Burnside disputes the number of times he asked the plaintiff this question, stating that he asked him "one time." Dep. of Burnside, 71-73. He also testified, "I could look at the man and tell he was black, but a lot of our clients are from Europe, all over the country. And Reggie in my opinion was a very distinguished person, carried himself very well, and didn't act like he was born and raised in the South, if you will. I thought he may have come from London. I thought he may have come from an island country..." *Id.* at 72.

5

not show that these reasons were a pretext for illegal discrimination.

The plaintiff's discriminatory hiring claim arises out of the defendant's failure to hire him until several months after Burnside and the plaintiff first spoke. Their first contact occurred in late 1996, but the plaintiff did not begin his employment with the defendant until May 6, 1997. At that time, the plaintiff was hired as a relief driver on the U2 tour.

In his deposition, the plaintiff testified that prior to the U2 tour the defendant offered him a position on a play or orchestra tour that never materialized. He also testified that he knew from his past experience that a tour can be canceled for any number of reasons, so that a tour promised to him might never take place. *See* Pl.'s Dep. at 34.

Burnside's question regarding the plaintiff's nationality does not necessarily indicate that the defendant intended to discriminate against the plaintiff on the basis of his race or that he harbored any animosity towards the plaintiff or members of his race. Although the plaintiff argues that the question is direct evidence of discrimination, by itself it is not particularly probative. In *Evans v. McClain of Georgia, Inc.*, the Eleventh Circuit held that a statement by an employer that an employee was "a very large, very strong, very muscular black man" who attempted to intimidate "three smaller or overweight white men" was not direct evidence of a discriminatory employment decision. 131 F.3d 957, 962 (11th Cir. 1997). The court noted, "[a]t best, these statements merely suggest a discriminatory motive which, by definition, makes them circumstantial evidence." *Id.* Such is the case here. At most, the nationality question proves that Burnside was interested in the plaintiff's background, an interpretation supported by his testimony.

The plaintiff suggests that the fact that the defendant had never employed a black driver before hiring the plaintiff is not significant in the absence of additional information regarding how

6

many blacks applied and were rejected and how many white applicants were hired. *See Evans*, 131 F.3d at 963 ("Statistics without an analytic foundation are virtually meaningless") (citing *Brown v. American Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir. 1992)).

According to the defendant, the plaintiff was offered a seat when one became available on the U2 tour. He was hired first as a team driver because "we just weren't going to hire anyone else that did not come in as a relief driver at that time and be observed by a primary driver." Dep. of J. Burnside at 70. Burnside testified that he wanted the plaintiff to be observed by an Ultimate Coach employee before the plaintiff was given a primary driver position; this is a legitimate, non-discriminatory reason for the defendant's alleged failure to provide the plaintiff with his own seat at the start of his employment.

A reasonable jury could not conclude from the evidence that the plaintiff was discriminated against on the basis of race; therefore, summary judgment is due to be granted on the plaintiff's discriminatory hiring claim.

II     Discriminatory Termination

To proceed with a claim that he was discriminated against when he was terminated for violating company policies, the plaintiff must present credible evidence that the same conduct was engaged in by one or more white employees who did not suffer the adverse employment action. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). The plaintiff has failed to do so.

The defendant has stated a number of reasons for the plaintiff's termination. In a letter to the plaintiff informing him of his termination, Burnside listed four reasons why the plaintiff was

7

discharged: 1) the plaintiff had refused to pull over during adverse weather conditions on the REO Speedwagon tour; (2) Pyramid Coach had complained about his performance and refused to permit him to continue driving; (3) the plaintiff failed to return Burnside's pages and calls; (4) the plaintiff damaged the coach he was driving and failed to immediately notify Ultimate Coach management.

The plaintiff responds that the reasons given by Ultimate Coach were a pretext for discrimination. He argues that white drivers who damaged the defendant's coaches were not terminated and provides excuses for his violations of company policies. He states that complaints against him by Ultimate Coach's clients were unfounded, that he did not receive Burnside's pages or messages, and that he tried to report the accident to the defendant at the time it occurred, but could not reach anyone.

While other white drivers who had accidents were not terminated, the evidence reflects that these were situations in which there was a reporting of the accident. *See* Dep. of Burnside at 131-36. The evidence also reflects that where a white driver had an accident and did not report it, he was in fact terminated.

It is irrelevant whether the plaintiff tried to report the accident or whether the clients' complaints were unjustified. An employer's good faith belief that an employee committed a work rule violation is sufficient to state a legitimate, non-discriminatory reason for the employee's termination. It is not the role of a district court to second-guess an employer's personnel decisions. "[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix* at 1187. The plaintiff has not offered credible evidence that could convince a reasonable jury

8

that the reasons offered by the defendant masked discriminatory motives for the plaintiff's termination. Summary judgment is therefore due to be granted as to the plaintiff's termination claims under Title VII and § 1981.

II     <u>Hostile Work Environment</u>

In order to constitute actionable race discrimination, racially motivated harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993). The isolated incidents reported by the plaintiff do not rise to this level of harassment.

As evidence of a hostile work environment, the plaintiff lists four statements that he claims were racially motivated: (1) a comment by another driver to Burnside that he "did not want to drive with a nigger;" (2) the use of the word nigger in the plaintiff's presence on one occasion; (3) the comment to another African-American employee that "they've got watermelon down here;" and (4) Ratcliffe's comment that "I told you we shouldn't have hired him." All in all, these four isolated incidents do not rise to the severity of harassment that is actionable under Title VII or § 1981.

Burnside testified that when he told the plaintiff about the other driver's comment, he also told him that the company was not racially biased. According to his deposition testimony, he took no action against the driver who made the comment because the driver worked for a different company, one with which Ultimate Coach planned to end its relationship at the conclusion of the U2 tour. *See* Dep. Of Burnside at 123-26. Burnside also testified that after the "watermelon" comment (made not to the plaintiff, but another black employee) the driver that made the comment

9

was removed from the remainder of the tour at the request of the client. *See id.* at 143-44.

As to the use of the word "nigger," the plaintiff testified that it was used in his presence only once. He testified at his deposition, "I made it aware that I didn't appreciate it and one of the guys, I think it was Al and maybe even Darryl apologized. I think it was more of a slip than anything else..." Pl.'s Dep. at 66.

Finally, Ratcliffe's comment "I knew we shouldn't have hired him" was made during his examination of the plaintiff's damaged coach. The plaintiff has offered nothing to support his inference that the statement was racially motivated. Having failed to present sufficient evidence to survive summary judgment, the defendant's motion as to the plaintiff's hostile work environment claim is due to be granted.

## IV     Retaliation

The plaintiff alleges that, in retaliation for complaining to Burnside about the use of the word "nigger," his driving assignments were decreased. In order to state a retaliation claim, the plaintiff must show that he engaged in a statutorily protected activity. *See Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997). It is clear that the plaintiff has done no such thing. In his deposition he complains that his work assignments were curtailed after Burnside informed him of one driver's comment that he didn't want to drive with the plaintiff because of his race. Regardless of whether this allegation could constitute a disparate treatment claim– which it does not[10]– the plaintiff has not shown that he actually engaged in a protected activity. Despite

---

[10]The plaintiff has failed to present evidence that his work assignments were actually decreased during his employment with the defendant.

the assertion of the plaintiff in his brief that "it is clear that the plaintiff complained to Mr. Burnside that he had been referred to as a 'nigger,'" the plaintiff's deposition says otherwise.[11] The defendant's motion for summary judgment is due to be granted because the plaintiff has no basis for stating a retaliation claim.

V.      Conversion

The plaintiff claims that he left personal items on his coach that were not returned to him after he left the defendant's employ. The plaintiff has offered no evidence that the defendant wrongfully withheld his property. The defendant offered into evidence a letter to the plaintiff in which he stated that they had found some of the plaintiff's items and stated "I can make arrangements to meet you here at the office so you can get the items that do belong to you..." In light of this evidence– and the fact that the plaintiff failed to brief the conversion claim to the court– the defendant's motion for summary judgment is due to be granted.

Conclusion

The defendant's motion for summary judgment is due to be granted as to all of the plaintiff's claims. Costs are to be taxed against the plaintiff.

Dated: Dec. 20, 1999

*[signature]*

---

[11] The plaintiff stated that he did not recall whether he told Ultimate Coach's management about the "nigger" comment by two co-employees. *See* Pl.'s Dep. at 67.

11

                                            Judge Sam C. Pointer, Jr.

Service List:
    Michelle A. Meurer
    Guy D. Chappell, III.
    Marvin L. Stewart, Jr.